**LOWE et al. v. CITY COUNCIL OF
AUGUSTA et al.**

No. 89.

District Court, S. D. Georgia,
Augusta Division.

April 27, 1942.

C. W. Killebrew, City Atty., and F. Frederick Kennedy, both of Augusta, Ga., for defendants.

LOVETT, District Judge.

H. A. Lowe, and others similarly situated, seek to enjoin the enforcement of a municipal ordinance of Augusta, Georgia,[1] regulating the business of taxicabs operating on its streets. Evidence has been taken, arguments heard, and briefs submitted and considered.

Jurisdiction is conceded, there being appropriate federal questions, diversity of citizenship and the requisite jurisdictional amount in controversy.

Augusta, Georgia, is located on the Savannah river, dividing the states of Georgia and South Carolina. The plaintiffs are citizens and residents of the state of South Carolina, and severally own and operate their automobiles, the ordinary passenger type or station wagons, as common carriers. Their business consists chiefly of transporting persons for hire to and from their work in textile manufacturing plants located in and near Augusta and across the river in South Carolina. Their passengers live both in Augusta and South Carolina. Only one-fourth of those they carry are casual passengers. They do no intra-state business. Their activities cover periods of time varying from five to eleven years.

In January 1941 the city adopted an ordinance that required the plaintiffs, and other taxicab operators, to provide a place of business, with telephone service and an attendant on duty at all times, within the city limits. Cruising upon the streets was forbidden. The passengers were limited to six in one car including the driver. The cabs were denied the right to use the principal business street in the retail, downtown district except to enter it for one block for discharge or taking on passengers. A license and a bond were required and certain charges were imposed, which in the ordinance were called occupation taxes for the use of the streets. The ordinance contained penalties for its violation. It is set out in full in the margin[2]. In February

Lee, Congdon & Fulcher and Wm. P. Congdon, all of Augusta, Ga., for plaintiffs.

[1] The proper corporate name of the municipality under its charter is "The City Council of Augusta".

[2] "Ordinance No. 1357. An Ordinance defining and regulating Taxicabs, Dime Taxicabs, Jitneys, and similar types of transportation operating within points of the City of Augusta, or from points without the City of Augusta to points within the City of Augusta, and from points within the City of Augusta to points without the City of Augusta; to require them to have a fixed place of business, telephone and person in attendance; to

1942, while this case was pending, the ordinance was amended by repealing the. sections requiring a license, imposing a tax and exacting a bond, and changing also

prohibit the cruising of such taxicabs and solicitation of business by them; to provide for licenses to be paid by such operators; to regulate the number of passengers that may be hauled by such vehicles; to provide for the giving of bond or filing of policy of indemnity insurance with the proper officer of the City of Augusta; to provide the streets upon which such persons may operate; to provide for penalties for violation of this ordinance; to repeal conflicting ordinance; and for other purposes.

"Be it Ordained by the City Council of Augusta as follows:

"Section 1. The terms of this ordinance, unless otherwise expressly provided shall apply to taxicabs, dime taxicabs, jitneys, taxicab companies and persons, firms, or corporations operating such forms of transportation, whether such operation and business is carried on exclusively within the City of Augusta, or exclusively from points within the City of Augusta to points without the City of Augusta and from points without the City of Augusta to points within the City of Augusta.

"Section 2. All persons, firms, or corporations operating transportation businesses described in Section 1 hereof shall, before engaging in said business, provide a place of business, telephone service to receive calls, and a person in attendance at all times for such purpose.

"Section 3. No vehicle described in Section 1 hereof shall carry more than six (6) passengers, including in such number the driver thereof.

"Section 4. Persons licensed hereunder and their employees are hereby prohibited from cruising upon the streets of the City of Augusta for the purpose of picking up passengers or for soliciting passengers upon the streets of the City of Augusta or from operating their vehicles in such manner as to attract the attention of prospective passengers, it being the intent and purpose of this ordinance that such business shall be operated and such vehicles shall be used to answer calls from passengers to be transported by such licensees hereunder.

"Section 5. Due to the heavy traffic upon Broad Street in the City of Augusta, the licensees hereunder are prohibited from the use of Broad Street between 5th and 15th streets except to enter said street for a distance not exceeding one block for the delivery of passengers, or for the same purpose in answering a call to receive a passenger for transportation hereunder.

"Section 6. Operators of vehicles licensed hereunder shall operate in a careful prudent manner in strict compliance with all of the traffic ordinances and police regulations of the City of Augusta.

"Section 7. Before engaging in the business herein described, the person, firm or corporation owning said vehicles shall procure a license from the Collector and Paymaster of the City of Augusta designating the type of operation desired and pay the following license fees, to-wit:

"(a) $15.00 for each vehicle to be operated exclusively within the City of Augusta.

"(b) $15.00 for each vehicle to be operated from points within the City of Augusta to points without the City of Augusta, and points without the City of Augusta to points within the City of Augusta.

"The charges here made are occupation tax for the use of the streets of the City of Augusta and is levied for the purpose of assisting in the maintenance of said streets.

"Section 8. Before receiving a license, the owner shall give bond, payable to the City Council of Augusta for the use or benefit of any person who may be injured or his property damaged as a result of the operation of said cab, with a good and sufficient security to be approved by the Finance and Appropriations Committee of the City Council of Augusta in the sum of $5,000.00. A new bond shall be given for each year of operation. In lieu of said bond the said applicant may file with the Clerk of the City Council of Augusta, a policy of public liability insurance in the sum of $5,000.00 for one person and $10,000.00 for more than one person, and $1,000.00 property damage to be issued by some reliable company approved by said Clerk having a duly licensed agent in the City of Augusta.

"Section 9. Any person, firm or corporation violating any of the provisions of this ordinance, whether as owner, manager, or driver of any vehicle regulated hereunder, shall, upon conviction in the Recorder's Court of the City of Augusta, pay a fine of not less than $25.00 nor more than $100.00, or be sentenced to serve not less than 25 or more than 90 days, in the City stockade. Each day of operation shall constitute a separate and distinct violation of this ordinance.

"Section 10. If any section or provision of this ordinance should for any reason be illegal or unconstitutional, it

some of the streets upon which the automobiles might operate[3].

The operators assail the ordinance as amended on the grounds it unduly burdens interstate commerce, denies equal protection of the laws, is beyond the power of the municipality, conflicts with federal and state legislation covering the field, and is discriminatory, unreasonable, null and void. It is also alleged the enforcement of the ordinance would create a monopoly for a competing corporation in violation of certain provisions of the Constitution of Georgia. The City of Augusta answers by saying that the ordinance is a valid exercise of its police power to regulate traffic upon its own streets and to promote the public safety.

It appears from the evidence that there are approximately 18 so-called interstate taxicabs similar to those operated by plaintiffs using the streets in Augusta; and there are 32 local, or intrastate, cabs that serve patrons in and about the city and entirely within the state of Georgia—making a total of 50 taxicabs for a city of sixty five thousand people. There are shown to be about twelve thousand automobiles passing a given point in the business district of the city *within a twelve-hour period. The interstate cabs*, therefore, constitute less than one-sixth of one percent of the automobiles presumably using the streets at some time in one day. The total cabs using the streets are less than one-half of one percent of such automobiles. There was testimony given, and not contradicted, that the expense of maintaining a place of business in the city, with telephone service and an attendant, would absorb and exceed all of the modest net profits derived by the plaintiffs in the operation of their automobiles, and would, therefore, not only burden but destroy the commerce they had developed over the years[4].

Congress, by the act of September 18, 1940, 54 Stat. 919, amending the Interstate Commerce Act, amended part II, regulating the transportation of passengers or property by motor carriers engaged in interstate commerce. 49 U.S.C.A. § 301 et seq.[5] The Interstate Commerce Com-

---

shall not affect the other portions of such ordinance.

"Section 11. Nothing herein shall be construed to prohibit persons licensed hereunder to engage in the business of hauling their contract passengers (persons hauled for a weekly or monthly compensation) from their homes in the City of Augusta to their places of employment without the City of Augusta, or from their homes without the City of Augusta to their places of employment in the City of Augusta, provided such licensees comply with the provisions of this ordinance.

"Section 12. All ordinances or parts of ordinances in conflict herewith are hereby repealed."

[3] The amendatory ordinance is as follows:

"An Ordinance to amend an Ordinance approved January 7, 1941 No. 1357 entitled '(the exact title of the above quoted ordinance is here inserted in the caption of this amendatory ordinance)'; so as to repeal certain provisions of said ordinance; and for other purposes:

"The City Council of Augusta hereby ordains:

"Section 1. That the words and figures "15th Street" are stricken from Section 5 of said Ordinance and the words and figures "13th Street" inserted in lieu thereof, so that Section 5 when amended shall read as follows:

"'Section 5. Due to the heavy traffic upon Broad Street in the City of Augusta, the licensees hereunder are prohibited from the use of Broad Street between 5th and 13th Streets except to enter said street for a distance not exceeding one block for the delivery of passengers, or for the same purpose in answering a call to receive a passenger for transportation hereunder'.

"Section 2. Sections 7 and 8 of said Ordinance are stricken so as to repeal same in their entirety.

"Section 3. It is the intention of this Ordinance not to repeal any portions relating to furnishing of bond or liability insurance policy that appear in the License Ordinance of the City of Augusta for the year 1942 with reference to taxicabs and automobiles for hire obtaining licenses from the City Council of Augusta.

"Section 4. All ordinances and parts of ordinances in conflict herewith are hereby repealed".

[4] The evidence discloses that the net profit of each owner was $750 to $800 each year. The owner-operators had no other business; it was their only means of livelihood. The cost of providing an office, telephone and attendant would exceed $1,800 annually.

[5] The act provides that the Interstate Commerce Commission is vested with authority to regulate the "procurement of and the provision of facilities for such transportation". 49 U.S.C.A. § 302(a). An office, attendant, etc., may be regarded as a facility for transporta-

mission regulates the motor carriers as provided in the act by issuing certificates of public convenience and necessity, and otherwise. Taxicabs, or other motor vehicles performing a bona fide taxicab service, having a capacity of not more than six passengers and not operating on a regular route or between fixed termini, though governed by the act, are excused from complying with certain of its provisions. They are not relieved, however, from conforming to the requirements of section 304 relative to qualification and safety of operation or standards of equipment, procuring and furnishing "facilities", etc. 49 U.S.C.A. § 303(b).

The Commission may, in its discretion, refer to a joint board composed of one member from each state in which the motor carrier operates such matters as applications for certificates, permits, etc., for appropriate action. Orders recommended by joint boards when filed become orders of the Commission. In November 1939 the plaintiff, Lowe, and nine others sought certificates of public convenience and necessity to operate their cabs between Augusta and the points in South Carolina which they now serve. After notice and hearing, a joint board composed of one member from the public service commissions of Georgia and South Carolina found and reported them exempt under section 303(b), saying in their report the applicants did not operate between fixed termini and they did operate over irregular routes. The applicants were not relieved from complying with the safety provisions of section 304 of the act.

The Commission under the order still exercises jurisdiction over the applicants in such matters as qualification of employees, if any, maximum hours of service, standards of equipment, and may prescribe reasonable requirements to promote safety of operation, and for proper facilities, etc. They may be required to keep uniform systems of accounts, to maintain continuous and adequate service, to transport baggage and express, and generally to comply with its orders. They are only relieved from obtaining certificates or permits to begin or continue in business, filing of tariffs, posting of rates, and the like.

■ There can be no question as to the power of Congress to completely oc-

cupy the field of legislation with respect to the transportation of property and passengers moving in interstate commerce by motor carriers, for the authority is supreme and plenary. It is "complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution". Gibbons v. Ogden, 9 Wheat. 1, 196, 6 L.Ed. 23. Even without federal legislation the states and their political subdivisions may not exclude persons engaged in interstate commerce from their limits, or fetter by unreasonable conditions their right to carry it on. Crutcher v. Kentucky, 141 U.S. 47, 11 S.Ct. 851, 35 L.Ed. 649; Western Union Tel. Co. v. Kansas, 216 U.S. 1, 30 S.Ct. 190, 54 L.Ed. 355; Pullman Co. v. Kansas, 216 U.S. 56, 30 S.Ct. 232, 54 L.Ed. 378; International Text-Book Co. v. Pigg, 217 U.S. 91, 30 S.Ct. 481, 54 L.Ed. 678, 27 L.R.A., N.S., 493, 18 Ann.Cas. 1103; Buck Stove & Range Co. v. Vickers, 226 U.S. 205, 33 S.Ct. 41, 57 L.Ed. 189. In the absence of such legislation local or internal commerce, "not affect[ing] other states, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government"[6], may be controlled by the local authorities; but if the city government may control the commerce that flows through it from outside of the state by such exactions as make the movement no longer profitable or possible, other states are affected and the general powers of the national government are circumscribed beyond the limits the Constitution allows. The dominating purpose of Congress in regulating motor carriers engaged in commerce among the states was to secure conformity to the standards one unified agency might prescribe in certain particulars, and to permit the states or municipalities to place other conditions on the movement of the commerce inconsistent with the declared objects of the act and antagonistic to the unity of control in that regard by the Commission would defeat its very purposes. Insofar as the city requires an office, telephone and attendant on duty at all times within the city, I think the local ordinance conflicts with the act of Congress, and must give way. "That which is not supreme must yield to that which is". Minnesota Rate Cases (Simpson v. Shepard), 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S.,

---

tion. See Second War Powers Act 1942, Public 507, approved March 27, 1942, amending Sec. 204 of the Interstate Commerce Act, 49 U.S.C.A. § 304, by adding Subsec. (e) thereto.

[6] Gibbons v. Ogden, supra.

1151, Ann.Cas.1916A, 18; Second Employers' Liability Cases (Mondou v. New York, N. H. & H. R. Co.), 223 U.S. 1, 32 S.Ct. 169, 56 L.Ed. 327, 38 L.R.A.,N.S., 44, and cases cited.

It may be conceded that appropriate local regulations adopted primarily to promote safety upon the streets of a municipality are not obnoxious to the Commerce Clause of the Constitution of the United States, article 1, § 8, cl. 3, where the indirect burden upon interstate commerce is not unreasonable. Looked at as a regulation of traffic only, it is not easy to understand why an office, attendant and telephone will make traffic conditions safer. The means are not adapted to the end sought. The legislative choice of means seems without rational basis. Such facilities would tend to increase rather than diminish both the number of cabs in operation and the frequency of their use of the streets. See South Carolina State Highway Dept. v. Barnwell Bros., 303 U.S. 177, 190, 625, 58 S.Ct. 510, 82 L.Ed. 734. The small number of cabs relatively to the whole number using the streets suggests there must be some other purpose behind the legislation. Whatever the purpose, as applied to the facts in this case, many of the provisions of the ordinance that remain after the amendment constitute a regulation, not of the use of the city's streets, but of interstate commerce. The regulation to the extent stated not only obstructs interstate commerce—it abolishes it. Such action is forbidden by the Commerce Clause. Buck v. Kuykendall, 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623, 38 A.L.R. 286; Bush & Sons Co. v. Maloy, 267 U.S. 317, 45 S.Ct. 326, 69 L.Ed. 627; Adams Express Co. v. State of New York, 232 U.S. 14, 34 S.Ct. 203, 58 L.Ed. 483; Crutcher v. Kentucky, 141 U.S. 47, 11 S.Ct. 851, 35 L.Ed. 649.

There is nothing in the cases cited by the defendants contrary to what the law, as I conceive it, permits a municipality to do where police power collides with rights under the Commerce Clause. Packard v. Banton, 264 U.S. 140, 44 S.Ct. 257, 68 L.Ed. 596, Stephenson v. Binford, 287 U.S. 251, 53 S.Ct. 181, 77 L.Ed. 288, 87 A.L.R. 721, and Nolen v. Riechman, D.C., 225 F. 812, involved state statutes alleged to be violative of the Fourteenth Amendment. No question was raised in these cases as to the power of the state to enact laws affecting interstate commerce or with discrimination relating thereto. In Thompson v. McDonald, 5 Cir., 95 F.2d 937 the plaintiff alleged himself to be a common carrier for hire operating motor trucks, and he sought to enjoin the Railroad Commission of Texas from interfering with his operations, the Commission being the body authorized by the state to exercise jurisdiction over, and to protect and preserve, the state highways, as well as to secure the safety of the traveling public over them. The plaintiff had unsuccessfully tried to obtain from the Commission a certificate to operate over a named route. The state court on review held the order denying the certificate was valid. The case dealt with control of congested traffic, and nothing else, in and about large centers of population, and while holding that the Motor Carrier Act of 1935 (now part II of the Interstate Commerce Act) did not completely occupy the legislative field, the decision is not in conflict with the cases cited herein with respect to obstructing interstate commerce by regulation unrelated to public safety. Sligh v. Kirkwood, 237 U.S. 52, 35 S.Ct. 501, 59 L.Ed. 835, had to do with a statute of Florida making it unlawful to deliver for shipment or to ship without the state citrus fruits which were unfit for human consumption. Congress had not legislated on the subject. The court held it was competent for the state legislature to find that it was essential for the success of the citrus industry, one of the great industries of the state, that its reputation be preserved in other states where the fruits found their most extensive markets. Kelly v. Washington, 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3, and South Carolina State Highway Dept. v. Barnwell Bros., 303 U.S. 177, 625, 58 S.Ct. 510, 82 L.Ed. 734, merely apply the familiar principle that when Congress circumscribes its regulation of interstate commerce and preempts only a limited field less than the whole possible of regulation, state legislation outside of the occupied field and otherwise admissible is not forbidden or displaced. Thus, state inspection of the hull and machinery of motor driven tugs, and state regulation limiting the weight and width of vehicles using state highways, were not forestalled, though Congress had legislated on related subjects.

There are other portions of the city ordinance remaining after its amendment that seem to me within the power of the municipality to enact and enforce, i. e., prevention of cruising upon the streets,

proscribing the use of one street, where traffic congests, for more than one block at a time, limiting the number of passengers in one automobile, and requiring the operator to drive with care and prudence in compliance with police regulations. Part II of the Interstate Commerce Act "does not provide for any tribunal to determine the method by which the public highways of any state shall be maintained or preserved, nor how the safety of the traveling public may be protected against any dangers that might be caused by an undue amount of traffic, nor does the act authorize the Interstate Commerce Commission to make the rules or regulations with reference to this". Thompson v. McDonald, supra, 95 F.2d at page 943. These sections of the ordinance by their terms are not directed at and, in my view, do not discriminate against those engaged in interstate commerce. Local taxicabs and like vehicles operating intra-state are bound by them. I find no support in the evidence for the charge that they create a monopoly in a competing carrier. The briefs for plaintiffs seem to assume that a competing coach line is allowed to travel the whole length of the principal business street, but this charge rests on assertion only. The proof seems lacking. The ordinance contains the conventional separability clause. A statute bad in part is not necessarily void in its entirety. A provision within the legislative power may be allowed to stand if it is separable from the bad, if it can be given legal effect and if it does not appear that the legislative department intended the law to stand or fall as a whole. I am unable to find that the city council would not have passed the ordinance if the parts now held invalid had been excised in the beginning. The language of the separability section suggests the contrary. Lynch v. United States, 292 U.S. 571, 586, 54 S.Ct. 840, 78 L.Ed. 1434; Watson v. Buck, 313 U.S. 387, 396, 397, 61 S.Ct. 962, 85 L.Ed. 1416, 136 A.L.R. 1426; Marsh v. Buck, 313 U.S. 406, 61 S.Ct. 969, 85 L.Ed. 1426, 136 A.L.R. 1434. As to discrimination, see New York Rapid Transit Corp. v. New York, 303 U.S. 573, 582, 58 S.Ct. 721, 82 L.Ed. 1024; Continental Baking Co. v. Woodring, 286 U.S. 352, 369, 52 S.Ct. 595, 76 L.Ed. 1155, 81 A.L.R. 1402; Packard v. New York, supra; Fifth Avenue Coach Co. v. City of New York, 221 U.S. 467, 31 S.Ct. 709, 55 L.Ed. 815; Schoenfeld v. Seattle, D.C., 265 F. 726, 730; Schlesinger v. Atlanta, 161 Ga. 148, 155, 129 S.E. 861; Clem v. LaGrange, 169 Ga. 51(2, 3, 4), 149 S.E. 638, 65 A.L.R. 1361. The other attacks on the ordinance on constitutional grounds seem unsubstantial and are without merit.

■ There remains for consideration the urge that the ordinance conflicts with the Georgia Motor Common Carriers Act of 1931. Georgia Code 1933, Sec. 68-601 et seq. By section 30 of that act (Georgia Code, Sec. 68-633) motor common carriers engaged solely in interstate commerce on or over the highways of the state are required to register their routes with the Georgia Public Service Commission and furnish certain information, give the bond or indemnity insurance required by the act, and pay an annual registration fee, all of which the evidence shows the plaintiffs have done. The section then provides: "It is not intended that the Commission shall have the power of regulating the interstate commerce of such motor common carrier, except to the extent herein expressly authorized as to such commerce". The act does not regulate local taxicabs operating exclusively within the corporate limits of a city, even though they "occasionally" go beyond such limits. The exemption is inapplicable to the plaintiffs in this case as they do not occasionally, but daily, go beyond the city's limits. Much of the controversy over alleged conflicts between the law of the city and the state is now brought to an end by the amendment of the ordinance. We are no longer concerned with the power of the city to require a license, impose a tax or exact a bond, as these sections of the original ordinance are removed by the amendment. But see Ellington Co. v. City of Macon, 177 Ga. 541, 170 S.E. 813; Mayor and Aldermen of City of Savannah v. Ellington Co., 177 Ga. 149, 170 S.E. 38; City of Albany v. Ader, 176 Ga. 391, 168 S.E. 1; Waycross v. Bell, 169 Ga. 57, 149 S.E. 641. The state law does not attempt to control the movement of traffic over the streets of municipalities by any designated routes, and properly so, for these are matters largely of local concern and can best be regulated by those public bodies best informed as to the traffic needs which change from time to time. I find no conflict between the ordinance as amended and the state act mentioned.

Counsel for plaintiffs may prepare and, on notice, present a decree consistent with this opinion permanently enjoining the defendants from enforcing those portions of

the ordinance held invalid; accompanied by appropriate findings of facts and conclusions of law as required by the rules.